Earnest CUSTOM and Chicago Welfare Rights Organization, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Arthur QUERN, in his official capacity as the Director of the Illinois Department of Public Aid, et al., Defendants.

No. 76 C 354.

United States District Court, N. D. Illinois, E. D.

Jan. 7, 1980.

Richard Jay Hess and James D. Weill, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

Peter M. Trobe, Mark Pearlstein, Sp. Asst. Attys. Gen., Chicago, Ill., for defendants.

## MEMORANDUM DECISION

MARSHALL, District Judge.

In this class action brought under 42 U.S.C. § 1983, plaintiffs challenged the defendants' method of processing applications under the Illinois General Assistance Program. Plaintiffs, who are Chicago resident applicants for benefits under the program, alleged that defendant Illinois Department of Public Aid (IDPA) imposed unreasonable delays in processing applications, contrary to plaintiffs' Fourteenth Amendment due process and equal protection rights. After extensive pre-trial discovery and motion practice, the parties entered into a consent declaratory judgment, pursuant to which the defendants have agreed to process and dispose of all general assistance applications within forty-five days of application, and in cases in which the applicants are entitled to benefits, to distribute the benefits to the applicants within that same forty-five day period. Thereafter plaintiffs submitted a motion for attorney's fees pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. This motion has been extensively briefed and is now ready for decision.

The parties' original briefs were filed prior to the Supreme Court's decision in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), and a crucial argument in defendants' opposition was based on the Eleventh Amendment. When *Finney* firmly established that the Eleventh Amendment is not a bar to assessing attorney's fees against a state or one of its agencies, the defendants here took another tack in opposition to plaintiffs' motion. Defendants first contend that plaintiffs did not substantially prevail. Alternatively they argue that even if attorney's fees are awarded, the plaintiffs' attorneys, who are employed by the Legal Assistance Foundation (LAF), a public interest legal aid organization, are not entitled to the same fees as a privately employed attorney. Finally, defendants challenge some of the hours charged by plaintiff's attorneys as duplicative.

In a hearing relating to attorney's fees held on September 15, 1978, we orally ruled that plaintiffs have substantially prevailed and are thus entitled to fees under § 1988, and that plaintiffs' attorneys are entitled to fees for all of the hours charged. We tentatively ruled, however, that when a plaintiff is represented by a public interest legal services agency, the defendant is obliged only to recompense the provider of the legal services for the cost of providing the services. We indicated that this cost was to be calculated by dividing the total budget of LAF by the product of the number of attorneys multiplied by a reasonable number of

hours per year.[1] Although we announced that we would calculate fees in this manner, the only order entered on September 15, 1978 was one directing LAF to submit data relating to its budget.

Upon further reflection we have reconsidered our position on the issue of the proper hourly attorney's fee for legal aid organizations. We see no need, however, to reconsider or discuss any of the other issues defendants have raised in their response to plaintiff's motion. Accordingly, our oral ruling of September 15, 1978 that plaintiffs substantially prevailed and that all of the 308 hours charged by plaintiffs' attorneys are reasonable will stand. We now turn to the question of the proper hourly rate for those hours.

Defendants do not contend that public interest legal aid attorneys are not entitled to any fees. Rather, they contend that a fee commensurate with the customary fees earned by private counsel would provide a windfall to plaintiffs' attorneys here, given the lower salaries said to be paid to LAF attorneys and LAF's nonprofit status. Moreover, defendants argue that a lesser rate will not have a detrimental effect on the attorney's fee statute's purpose of encouraging enforcement of the civil rights acts. Thus defendants urge that legal aid attorneys should receive an hourly attorney's fee measured by their salaries. Alternatively, they contend that the Criminal Justice Act's fee scale for appointed attorneys, which allows for $20 per hour for out of court time and $30 per hour for in court time, is a fair measure here. *See* 18 U.S.C. § 3006A(d)(1). Finally defendants argue that the amount of fees should be moderat-

ed because the funds will come from the state treasury.

Plaintiffs contend that the legislative history to § 1988 indicates that no distinction should be made between private attorneys and attorneys employed by public interest legal aid organizations. Moreover, plaintiffs attack the basis for such a distinction, arguing that it would frustrate the purpose of the Act by unduly restricting the services afforded to civil rights plaintiffs.

■ At the outset we emphasize that the only dispute remaining is the amount of fees, because defendants do not contend that legal aid attorneys for a prevailing party are not entitled to any fees. Most courts applying statutory grants of fees have held that legal aid organizations are entitled to fees. *See, e. g. Hairston v. R & R Apartments*, 510 F.2d 1090, 1093 (7th Cir. 1975); *EEOC v. Enterprise Assoc. Steamfitters Local No. 638 of U. A.*, 542 F.2d 579 (2d Cir. 1976), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). The legislative history to § 1988 also indicates that such organizations are entitled to fees.[2] *See also,* Note, *Awards of Attorney's Fees to Legal Aid Offices*, 87 Harv.L.Rev. 411 (1973). We must also emphasize that § 1988, which states only that "the court, in its discretion, may allow the prevailing party . . . , a reasonable attorney's fee as part of the costs," does not indicate how to determine what amount is reasonable. The statute leaves that determination to our discretion. But because a prevailing party should ordinarily receive fees unless "special circumstances would render an award unjust," *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968),[3] an award

---

**1.** We used 1,500 to 1,750 hours as a rough estimate of the number of billable hours in a year.

**2.** The House Report states that the "prevailing party is entitled to counsel fees even if represented by an organization or if the party is itself an organization. *Incarcerated Men of Allen County v. Fair* [507 F.2d 281 (6th Cir. 1974)]; *Torres v. Sachs*, 69 F.R.D. 343 (S.D.N.Y.1975), *aff'd* 538 F.2d 10 (2d Cir. 1976); *Fairley v. Patterson*, 493 F.2d 598 (5th Cir. 1974)." H.Rep.No. 94–1558, 94th Cong., 2 Sess. p. 8 n.16 (1976). The attorneys in all three of the

cited cases worked for nonprofit legal services organizations.

**3.** Other attorney's fee statutes applicable in civil rights cases, such as the one applicable to Title VII, *see* 42 U.S.C. § 2000e–5(k), are similar to § 1988. Because Congress intended to achieve consistency in the availability of attorney's fees in civil rights cases by enacting § 1988, we will rely on cases, such as *Piggie Park*, dealing with these other attorney's fees statutes to aid our resolution of the issue

of fees that is so low as to frustrate the purpose of the act would constitute an abuse of this discretion. *See* Berger, *Court Awarded Attorney's Fees: What Is "Reasonable"?*, 126 U.Pa.L.Rev. 281, 306 (1977).

■ Defendants' argument that LAF is entitled to fees at a reduced rate is premised on the fact that LAF may not and, accordingly, does not attempt to earn a profit. But this premise does not recognize that a court assessing attorney's fees may approach the determination of amount from two possible perspectives. From one perspective, which defendants presume that we should use, a court decides what fee is necessary to adequately compensate the attorney for his or her time. Adequate compensation would include a reasonable profit. There is another approach, however, pursuant to which a court attempts to calculate the "value" of the attorney's services. Value of service is not rigidly tied to profits but is figured with an eye toward what the services are worth to the client and what prices those services would bring in the marketplace. Although these two approaches are different, a court will come to the same result regardless of the approach it uses, so long as the fee award is based on the hourly rate of the plaintiff's attorney. The hourly rate, established by market forces, will reflect both the value of service and a profit.[4]

When, however, the fee is to go to a nonprofit legal services organization, no hourly rate guides our path, and the profit motive is by definition absent, or at least reduced to the extent of an award of fees above the organization's cost of doing business. But the value of the services is not equivalently diminished. Thus to determine what hourly rate is appropriate here, we must first inquire whether Congress intended an award of fees to reflect both the value of the services and a reasonable profit. Then, after determining whether the

value of LAF's services is equivalent to that of a private practitioner, we will consider whether the absence of a profit motive justifies a reduction of fees to LAF.

■ The statute's purpose is clear from its legislative history. Because civil rights laws depend heavily on private enforcement, "fee awards have proved an essential remedy if citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." S.Rep.No. 94–1011, 1976 U.S.Code Cong. & Admin.News at 5910. Thus the attorney's fee statute was designed "to promote the enforcement of the Federal civil rights acts, as Congress intended, and to achieve uniformity in those statutes and justice for all citizens." H.R.Rep.No. 94–1558, 94th Cong., 2d Sess. 1, 19 (1976). *See also* Remarks of Senator Tunney, 122 Cong. Rec. 33313 (Sept. 29, 1976); Remarks of Congresswoman Holtzman, 122 Cong.Rec. 35127 (Oct. 1, 1976) ("The act will help to assure that all Americans can have access to the courts to obtain the protections against discrimination contained in our laws and the Constitution."). Congress intended to facilitate the effective implementation of civil rights laws by all citizens, and to prevent those laws from becoming "mere hollow pronouncements which the average citizen cannot enforce." S.Rep.No. 94–1011, 1976 U.S.Code Cong. & Admin.News at p. 5913. In addition, Congress recognized the potential complexity of civil rights cases. The legislative history states that

It is intended that the amount of fees awarded under S. 2278 [42 U.S.C. § 1988] be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature. *Id.*

■■ We interpret this legislative history to urge if not require judicial recognition

presented here. *See* S.Rep. 94–1011, p. 4, 94th Cong., 2d Sess., U.S.Code Cong. & Admin. News at pp. 5908, 5912 (1976).

**4.** Because the court determines the hourly rate, the figure really represents the hourly rate for all attorneys of a particular skill and experi-

ence. This makes the fit between value of service and compensation for time even closer, because the attorney is prevented from inflating his or her compensation to a level which would outstrip the value of his or her services.

of both the compensatory and the value aspects of an award of attorney's fees. On the one hand Congress wished to encourage attorneys to represent civil rights plaintiffs in order to ensure effective enforcement of the civil rights laws. To accomplish this purpose, the court would clearly have to allow for a profit as part of the fees. On the other hand, the legislative history also clearly indicates that the value of the services is also relevant. By comparing, for purposes of discussing the amount of fees, civil rights cases to other "complex federal litigation, such as antitrust cases," Congress implicitly placed a value on the services performed by attorneys in civil rights cases and instructed us to credit that value.[5] Moreover, Congress enacted § 1988 to reduce civil rights plaintiffs' litigation costs, and litigation costs would be measured in terms of the value of the services to the plaintiff and the cost of those services in the marketplace. As the court in *Clark v. American Marine Corp.*, 320 F.Supp. 709, 711 (E.D.La.1970), aff'd 437 F.2d 959 (5th Cir. 1971), stated with respect to the attorney's fee section of Title VII,

> Congress certainly intended any award under the statute to be reasonable by traditional standards. It did not look, like Lear's jester, to the breath of the unfeed [sic] lawyer, but considered that the prevailing litigant should be able to pay the laborer the worth of his hire.

*See also Tillman v. Wheaton-Haven Recreation Ass'n*, 517 F.2d 1141, 1148 (4th Cir. 1975);[6] *Rodriguez v. Taylor*, 569 F.2d 1231, 1248–49 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); *White v. Beal*, 447 F.Supp. 788, 797 (E.D.Pa. 1978).

There is no basis for concluding that the value of services provided by LAF is less than that of services that private attorneys provide. As the Third Circuit stated in *Rodriguez v. Taylor, supra* at 1248, "Legal aid organizations are often the sole representatives of the economically, socially, and culturally deprived in their disputes with landlords, government welfare agencies, employers and creditors." Moreover, LAF is willing to undertake representation in difficult cases involving unsettled legal issues, cases which private practitioners, who may not have large blocks of time to devote to protracted civil rights cases, may be reluctant to accept. We take notice of the fact that the quality of representation that LAF provides is equivalent to that of attorneys in private practice, and if the clients represented by LAF were forced to pay for the legal services LAF provides without charge, they would have to pay the prevailing market rate. Because the value to the client and to societal interests is substantial, we cannot hold that LAF attorneys' time is less valuable than the time of attorneys in private practice. Thus to recognize this equivalent value, we should award plaintiffs' counsel the market rate unless the fact that LAF does not make a profit justifies a decrease in the award.

■ As we have stated, the statute was designed to promote vigorous enforcement of the civil rights laws. An award of fees which allows private attorneys to earn a profit is necessary to accomplish this end. We see no reason to reduce an award of fees, however, simply because plaintiff's attorney does not earn a profit. In the instant case, a rate which subtracts the profit elements and compensates LAF only for its costs would have a detrimental impact on the availability of representation for civil rights plaintiffs. In civil rights cases LAF receives fees only if its clients substantially

---

**5.** It is significant that the quoted statement from the Senate Report is the only reference in the legislative history to the amount of fees.

**6.** The *Tillman* court, applying the attorney's fee statute applicable to Title II, *see* 42 U.S.C. § 2000a–3(b), emphasized that because the attorney's fee statute's goal was "to encourage people to seek redress of unlawful discrimination," the award is not "strictly speaking . . .

simply compensatory." *Tillman, supra* at 1148. Instead, the court held that fees should be measured "by the reasonable value of the lawyer's service." *Id.* Although we agree that the purpose of the award is not compensatory, a recognition of the profit incentive is nevertheless necessary to achieve the purpose of the Act. But Congress has also clearly indicated that the value of services is relevant.

prevail. Defendants' argument that fees at market rates, if awarded to LAF for all billable hours in a year, would produce a windfall is therefore unpersuasive, because LAF could not possibly receive fees for all of its billable hours.[7] In contrast, attorneys representing criminal defendants under the Criminal Justice Act, if they receive the fee provided in the statute, do not receive the market rate, but they receive fees regardless of the outcome of the case. *See* 18 U.S.C. § 3006A(d)(1). *See also Rodriguez v. Taylor, supra; Donaldson v. O'Connor,* 454 F.Supp. 311 (N.D.Fla.1978). LAF has limited resources, and is able to devote only a portion of its time and resources to civil rights cases.[8] An award of fees encompassing more than simply LAF's costs presumably will enable LAF to expand its commitment to civil rights cases. Just as an award of fees, with a profit included, to a private practitioner encourages him to accept future civil rights cases, an award above LAF's costs allows it to accept additional civil rights cases as well. Moreover, an award covering more than LAF's costs would permit LAF to continue to undertake representation in cases involving unsettled and important legal issues. These are cases which require large expenditures of time and which have an extremely uncertain prospect for attorney's fees at the outset, so uncertain as to discourage many private practitioners. Thus an award exceeding LAF's costs will help defray the costs for the hours for which LAF receives no fees and will allow it to devote more hours to civil rights cases. Although LAF does not and cannot earn a profit, an award at the market rate will nevertheless effectuate the purposes of the Act. *See* Berger, *Attorney's Fees: What Is "Reasonable"?, supra* at 323.

The defendants would presumably respond to the foregoing reasoning by arguing that any award of fees will serve to promote the statute's purpose, because any award of fees LAF receives will enable it to expand its representation in civil rights cases beyond what is provided for in the budget. This is undoubtedly true, and the difference in effect on the statute's purpose between a costs award and a market award is one of degree. Presumably we would have the discretion to set fees at any point along the continuum between LAF's costs and the prevailing market rate. But we have determined that the value of LAF's services is equivalent to that of a private practitioner's services and that an above cost award will have the salutary effect on the enforcement of the civil rights acts that Congress sought in passing § 1988. Therefore, LAF should be allowed to use whatever portion of the fees that would constitute "profits" to the private practitioner to expand its representation in the civil rights area. We decline to reduce an award merely because the plaintiff is represented by a nonprofit organization.

This holding is not unfair to defendants, because the identity of opposing counsel is fortuitous. Moreover, our holding is supported by the weight of authority. Four circuits have specifically held that an award of fees should not be reduced because the plaintiff's attorney worked for a legal services organization. *See Reynolds v. Coomey,* 567 F.2d 1166 (1st Cir. 1978); *Tillman v. Wheaton-Haven Recreation Ass'n, supra* (4th Cir.); *Torres v. Sachs,* 538 F.2d 10 (2d Cir. 1976); *Fairley v. Patterson,* 493 F.2d 598 (5th Cir. 1974).[9] The Third Circuit has held that "excessive consideration" of either legal aid salaries or Criminal Justice Act fee scales constitutes an abuse of discretion. *Rodriguez v. Taylor, supra.* The Seventh Circuit, although not presented with the question at issue here, stated in *Hairston v. R & R Apartments, supra* at 1093, that for purposes of a fee award, "an organization

---

**7.** In addition, LAF handles non-civil rights cases for which fees are not available.

**8.** Mr. Burns, one of the attorneys for plaintiffs, represented to us at the hearing on September 15, 1978, that a relatively small portion of LAF's set budget is allocated to civil rights cases. *See* Exhibit B to Data and Computation Pursuant to Court's September 15, 1978 Order.

**9.** Both *Torres* and *Fairley* were cited by the House Report in support of the proposition that organizations are entitled to attorney's fees. *See* note 2 *supra.*

providing free legal services stands in the same position as a private attorney to whom a fee is owed." *See also Kulkarni v. Nyquist*, 446 F.Supp. 1274 (N.D.N.Y.1977); *Stephenson v. Simon*, 448 F.Supp. 708 (D.D. C.1978).[10]

▆▆▆ Finally, defendants claim that we should reduce the award because the funds will come from the state treasury. In *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Supreme Court held that § 1988 is applicable to state defendants and that the Eleventh Amendment does not bar an award of fees. There is no indication in the opinion that a different standard of reasonableness is to apply to awards against state governments. Although the Court had no occasion to consider the amount of fees in *Hutto*, the holding, by indicating that § 1988 applies in full force to the states, provides support for applying the same standards to state defendants as to private defendants.[11] *See Rodriguez v. Taylor, supra* at 1249 n.32. We will, however, consider the fact that fees will come from state funds as a factor entering into our discretionary determination of the proper hourly rate. *See Keyes v. School District No. 1, Denver, Colorado*, 439 F.Supp. 393 (D.Colo.1977).

Plaintiffs have asked for fees of $45 per hour for Mr. Burns and $50 per hour for Messrs. Weill and Hess. We have considered the affidavits submitted by these attorneys and in light of their experience and of the complexity of the case we find that the requested fees are reasonable.

Moreover, we do not believe that the requested hourly rate is so high as to justify, in the exercise of our discretion, a reduction because the state treasury will pay the award. Accordingly, judgment will enter in favor of the plaintiffs and against the defendants awarding attorney's fees at the rate of $50 per hour for 11.5 hours of Mr. Weill's time, $50 per hour for 77.75 hours of Mr. Hess's time, and $45 per hour for 218.75 hours of Mr. Burn's time, for a total of $14,306.25. The judgment should be paid directly to plaintiffs' attorneys. *See Hairston, supra.*

---

**10.** The D.C. Circuit's position is unsettled. In *Copeland v. Marshall*, 193 U.S.App.D.C. 219, 594 F.2d 244 (D.C. Cir. 1978), the court held that attorney's fees in a Title VII case against the federal government were to be calculated by figuring the firm's costs and adding a reasonable profit. This decision was vacated when the circuit granted rehearing *en banc*. The original panel then issued another opinion to clarify its position and to answer some of the criticisms of the original opinion. *Copeland v. Marshall*, 20 FEP Cases 79 (D.C. Cir. 1979). The *en banc* decision has not been issued. The *Copeland* cost plus rationale apparently would apply only to suits against the government and would apply both to private practitioners and to legal aid organizations. The court also stated

that legal aid organizations should receive a reasonable profit above their costs. Finally, we note that the *Copeland* formula would not apply to a fee award under § 1988, because the D.C. Circuit has held, in *NAACP v. Civiletti*, 197 U.S.App.D.C. ——, 609 F.2d 514 (D.C. Cir. 1979) that the United States did not waive its sovereign immunity by the enactment of § 1988 and is thus not liable for fees under that section.

**11.** Moreover, the Court counseled moderation in the amount of a fee award based on defendants' bad faith. 437 U.S. at 692, 98 S.Ct. 2565. The Court made no such admonition with respect to fees awarded pursuant to § 1988.